## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
## SAVANNAH DIVISION

| | | |
|---|---|---|
| STEPHANIE DUNN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV420-090 |
| | ) | |
| BRITTNEY PASCOE, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>ORDER</u>

Plaintiff Stephanie Dunn brought this auto wreck negligence action in the State Court of Chatham County, Georgia; it was subsequently removed. Doc. 1-2 at 4-5 (Complaint); doc. 1 at 1 (Notice of Removal). Before the Court are Defendant Brittney Pascoe's motions to exclude the testimony of four of Plaintiff's expert witnesses. Docs. 90, 91, 92 & 93. Plaintiff responded to all four motions, docs. 103, 104, 105 & 106, and Defendant replied, docs. 111, 112, 113 & 114. Defendant also filed an unopposed request for oral argument regarding those motions. Doc. 94; *see* S.D. Ga. L. Civ. R. 7.5. All pending motions are ripe for disposition.[1]

---

[1] Defendant attached "placeholder" documents to her *Daubert* motions, *see, e.g.*, doc. 90-1, and moved for leave to substitute sealed exhibits for the placeholders. Doc. 99. The Court denied Defendant's request because she did not establish good cause to justify sealing the exhibits, and afforded her an opportunity to renew the

# ANALYSIS

Federal Rule of Evidence 702 compels the Court to perform a "gatekeeping" function concerning the admissibility of expert scientific evidence. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 n.7, 597 (1993)).  In performing this task, the Court must consider whether the party offering the evidence has shown:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Frazier*, 387 F.3d at 1260 (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir.1998)).  The proponent of the expert opinion bears the burden of establishing qualification, reliability, and

---

request.  Doc. 130 at 5-6.  She did not renew her request before her deadline to do so. *See generally* docket.  Plaintiff, however, appears to have filed most (if not all) of the relevant exhibits on the open docket as attachments to her responses. *Compare, e.g.*, doc. 91-1 (Defendant's placeholder for Mahan's deposition transcript), *with* doc. 105-1 (Plaintiff filed Mahan's deposition transcript as an exhibit).  Although Defendant sent the Court copies of the documents via email for purposes of deciding her motion to seal, *see* S.D. Ga. L. Civ. R. 79.7(c), she has not renewed the motion or filed the exhibits "in the normal course," so Court will dispose of her *Daubert* challenges based on the record as it stands.

helpfulness by a preponderance of the evidence. *Daubert*, 509 U.S. at 592, n.10.

Under the first prong, "experts may be qualified in various ways. While scientific training or education may provide possible means to qualify, experience in a field may offer another path to expert status." *Frazier*, 387 F.3d at 1260-61; *see also* Fed. R. Evid. 702 (a witness may be qualified as an expert by "knowledge, skill, experience, training, or education[.]"). But, "[w]hen an expert witness relies mainly on experience to show he is qualified to testify, 'the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.' " *Payne v. C.R. Bard, Inc.*, 606 F. App'x 940, 942-43 (11th Cir. 2015) (quoting *Frazier*, 387 F.3d at 1261).

As to the second prong, the reliability "criterion remains a discrete, independent, and important requirement for admissibility." *Frazier*, 387 F.3d at 1261. "The Supreme Court in *Daubert* set out a list of 'general observations' for determining whether expert testimony is sufficiently reliable to be admitted under Rule 702." *United States v. Brown*, 415 F.3d 1257, 1267 (11th Cir. 2005) (citation omitted). These factors, or

observations, inquire into the expert's "theory or technique" and are: "(1) whether it can be (and has been) tested; (2) whether it has been subjected to peer review and publication; (3) what its known or potential rate of error is, and whether standards controlling its operation exist; and (4) whether it is generally accepted in the field." *Id.* (citation omitted). "Sometimes the specific *Daubert* factors will aid in determining reliability; sometimes other questions may be more useful." *Frazier*, 387 F.3d at 1262. "Indeed, the Committee Note to the 2000 Amendments of Rule 702 expressly says that, '[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.' " *Id.* at 1261.

Expert testimony must also assist the trier of fact. *Frazier*, 387 F.3d at 1262. "By this requirement, expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person." *Id.* (citation omitted). This inquiry is commonly called the "helpfulness" inquiry. *Prosper v. Martin*, 989 F.3d 1242, 1249 (11th Cir. 2021) (citing *Frazier*, 387 F.3d at 1260). "Expert testimony which does

not relate to any issue in the case is not relevant and, ergo, non-helpful."

*Id.* (quoting *Daubert*, 509 U.S. at 591).

## I.   Defendant's conflation of *Daubert*'s "reliability" and "helpfulness" prongs.

The Court must address an argument raised in several of Defendant's briefs before discussing the merits of her *Daubert* motions. She argues in multiple instances that testimony should be excluded under *Daubert*'s "helpfulness" prong because it is unreliable.[2]  As the Eleventh Circuit has explained, "reliability[ ] and helpfulness . . . remain distinct concepts and the courts must take care not to conflate them." *Frazier*, 387 F.3d at 1260.  The Court is not persuaded by Defendant's "helpfulness" challenges which merely reassert "reliability" arguments raised elsewhere in her *Daubert* briefing.

---

[2]  *See, e.g.*, doc. 91 at 12 ("Dr. Mahan's expert testimony that the herniations in Plaintiff's cervical spine, based upon her cervical MRIs, is very unreliable and will not assist, but rather mislead and confuse, the jury. [sic]"); doc. 92 at 15-16 (arguing that "the jury will be confused and misl[ed] rather than assisted by Dr. Joye's testimony and life care plan" because he did not base his opinions on sufficient sources); doc. 93 at 22 ("[T]he jury will be presented with misleading and speculative opinions that were made using unreliable methodology and have not been peer reviewed in any way.  Therefore, Dr. Chappuis' opinions will not assist the jury."); doc. 112 at 5 (Mahan's testimony "is flawed, fails to rely on sufficient facts and/or data, and is detrimentally subjective.  Thus, his testimony will ***not*** assist the jury and should not be allowed.").

## II.   <u>Defendant's motion to exclude Dr. Todd Joye's testimony.</u>
<u>(Doc. 92)</u>

Plaintiff seeks to introduce the testimony of Dr. Todd Joye, a life care planning expert, regarding "the anticipated, future medical care that Plaintiff may need as a result of her injuries from the subject collision."  Doc. 103 at 2; *see also* doc. 103-1 at 39-47 (Joye's "Medical Life Care Plan" for Plaintiff).   Defendant does not dispute Joye's qualifications; rather, she argues that his testimony is unreliable.  *See, e.g.*, doc. 92 at 9, 15.

Defendant contends that the life care plan's predictions are "not supported by sufficient facts and data."  Doc. 92 at 9.  She asserts that although Joye bases his opinions on a review of Plaintiff's medical records, an interview with Plaintiff, and his knowledge, training, and experience, he has not "specified nor explained any methodology he employed to determine the extent of treatment Plaintiff would require for the rest of her life nor how he calculated the speculative costs of such treatment."  *Id.* at 12 (discussing doc. 103-1 at 39).  However, a cursory review of Joye's deposition transcript shows that he offered *some* explanation why the medical records, interviews, and his experience led him to his opinions regarding Plaintiff's future needs.  *See, e.g.*, doc. 103-

6

1 at 26-29.  He testified, e.g., that he based his opinion that Plaintiff will need physician follow-ups, physical therapy, and chiropractic care on his "20 years of seeing patients with . . . [injuries similar to Plaintiff's]." *Id.* at 29; *see also id.* at 26 (Joye explains that Plaintiff will require four follow-ups a year based on his "experience seeing patients such as her."). He also testified that his inclusion of the drug Neurontin in the life care plan was based on Plaintiff's current Neurontin prescription, *id.* at 27-28, and that he included a "lumbar orthosis" brace in the report based on Plaintiff's statements that she is experiencing difficulties performing household tasks as a result of her alleged injury*, id.* at 29.  Joye also included a detailed cost calculation chart with his life care plan, including source citations for the projected prices of several treatments.  *Id.* at 46-47.

The Court agrees with Defendant that Plaintiff's defense of the life care plan's reliability is limited to a "conclusory assurance" that Joye relied on the medical records, interviews, and his experience.  Doc. 113 at 5-6*; see, e.g.,* doc. 103 at 4-5 (Plaintiff argues that Joye relied on those sources without explaining how they led to his future care predictions). However, Plaintiff's burden to show the reliability of Joye's opinions is

only triggered if Defendant sufficiently "call[s] [their reliability] into question." *Rodriguez v. Riddell Sports, Inc.*, 242 F.3d 567, 581 (5th Cir. 2001) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999)); *see also Queen v. W.I.C., Inc.*, 2017 WL 3872180, at *5 (S.D. Ill. Sept. 5, 2017) (in the context of a "qualification" challenge, explaining that the proponent party's burden is triggered when "a party calls into question the qualification under *Daubert*"). Joye provided multiple connections between his experience, the interviews, and the medical records and his opinions at his deposition. Defendant does not explain why those connections are insufficient, *see generally* docs. 92 & 113, and the Court declines to construct an argument for her. *See Hannah v. Armor Corr. Health Servs., Inc.*, 2021 WL 1777881, at *6 (M.D. Fla. Mar. 8, 2021) ("The Court is mindful that the exclusion of expert testimony is an *exception*, not the rule, for evidentiary admissions under *Daubert*, *Kumho Tire*, and the Federal Rules of Evidence. . . . Moreover, the Court need not develop . . . conclusory arguments or address arguments unsupported by authority.") (emphasis in original) (citations omitted). To the extent Defendant believes that Joye's reliance on the medical records, the

interviews, and his experience weaken his life care plan, she may address the issue on cross examination.

Defendant also argues that the life care plan's predictions are unreliable by highlighting sources Joye purportedly should have considered, but did not. *See, e.g.*, doc. 92 at 10 (arguing that Joye never consulted with Plaintiffs treating physicians, or reviewed her pre-accident medical records); *id.* at 13 (noting that Joye never "[sought] the input of Plaintiff['s] . . . family members regarding her condition"); doc. 113 at 2 (Joye did not "perform an independent examination of Plaintiff"). However, "[a]s a general rule, questions relating to the bases and sources of an expert's opinion affect the *weight* to be assigned that opinion rather than its *admissibility* and should be left to the jury's consideration." *Primrose Operating Co. v. National American Ins. Co.*, 382 F.3d 546, 562 (5th Cir. 2004) (quoting *United States v. 14.38 Acres of Land, More or Less Situated in Leflore County*, 80 F.3d 1074, 1077 (5th Cir.1996) (emphasis added by *Primrose* court)). The record indicates that Joye identified the sources he used to reach his opinions, and explained how those sources led to his conclusions. *See Frazier*, 387 F.3d at 1261 ("[i]f the witness is relying solely or primarily on experience, then the witness

must explain *how* that experience leads to the conclusion reached[.]") (quotations and citations omitted).  *Cf. August v. Urquhart*, 2022 WL 16745769, at *3 (D. Colo. Sept. 20, 2022) (lifecare planner's opinions are unreliable when she "states that she reviewed Plaintiff's medical records, [but] makes no effort to explain how those records affected her conclusions.").  Defendant may address Joye's failure to consider certain sources on cross-examination.  *See Tardif v. City of New York*, 2022 WL 2195332, at *11 (S.D.N.Y. June 17, 2022) ("The degree of involvement by [Plaintiff's] treating physicians in [the] life care planning goes to the weight of the evidence, not its admissibility.").[3]

Defendant argues that this case is analogous to *Queen*, doc. 92 at 8-9; doc. 113 at 3-4, where the court excluded a life care planner's opinions based on his "speculation and unsupported conclusions," 2017 WL 3872180, at *6.  In *Queen*, however, the life care planner's "report and his deposition testimony fail[ed] to provide insight into the methods by which [he] reached the conclusions . . . ."  *Id.* at *4.  As discussed above, absent any argument why Joye's reliance on the medical records, interviews, and

---

[3]  Defendant asks the Court to exclude all of Joye's testimony because "the life care plan completely ignores the lack of severity and longevity of Plaintiff's alleged injuries."  Doc. 92 at 2.  Defendant may attack the projected timeline of Joye's lifecare plan, and his impression of Plaintiff's injury's severity on cross examination.

his experience is insufficient, the Court declines to issue a blanket exclusion on his testimony. *See Wine v. Comer*, 590 F. Supp. 3d 1200, 1208-9 (E.D. Mo. 2022) ("[The life care planner's] methodology includes assessing whether the client has long term needs; reviewing the client's medical records; interviewing the client; and creating the life care plan. . . . Unlike in *Queen v. W.I.C.*, [the life care planner] drafted the life care plan himself and explained his methodology.").[4]  Defendant's motion to exclude Joye's testimony is **DENIED**.  Doc. 92.

### III.   Defendant's motion to exclude Dr. Nikanor Volkov's testimony.  (Doc. 90)

Plaintiff seeks to introduce the testimony of economist Dr. Nikanor Volkov regarding the "present value of [Joye's] life care plan[.]"  Doc. 106 at 2.  Defendant argues that the Court should exclude Volkov's testimony because it is "based entirely on [Joye's] life care plan", which should also be excluded.  Doc. 90 at 8.  Since Defendant's motion to exclude Joye's testimony is denied, doc. 92, this argument is moot.

---

[4] Defendant also argues that the Court should issue a blanket exclusion on Joye's opinions because Plaintiff's testimony that her neck and shoulder injuries healed contradicts Joye's prediction that she will need, e.g., cervical injections, MRIs, physical therapy, and chiropractic care.  *See* doc. 92 at 11.  This argument is more appropriately directed at the weight of Joye's opinion rather than its admissibility. Defendant may present conflicting evidence to the jury.

Defendant also argues that even if Joye's testimony is admissible, Volkov's opinions are not reliable or helpful.  *See, e.g.*, doc. 90 at 9-11. Plaintiff does not respond to these arguments.  *See* doc. 106 at 2-3 (Plaintiff incorrectly asserts that "Defendant does not challenge Dr. Volkov's . . . methodology", and that "Defendant's sole basis for excluding Dr. Volkov's testimony at trial comes from her motion to Exclude Dr. Todd Joye[.]")  Nevertheless, Defendant's motion is **DENIED** because she has not triggered a *Daubert* inquiry by calling Volkov's reliability or helpfulness into question.  *See Kumho Tire*, 526 U.S. at 149.

Defendant asserts that Volkov's opinions are unreliable because he did not conduct an "independent evaluation of the facts and circumstances regarding Plaintiff Dunn's alleged injuries."  Doc. 90 at 9-10; *see also id.* at 9 ("Dr. Volkov assumes that recommendations in the life care plan prepared by the life care planner, Dr. Joye are reasonable and necessary, but he has not done an independent assessment of the recommendations, nor can he.  He is not a doctor.").  However, a cursory review of Volkov's report indicates that his testimony relates to the present value of the figures in Joye's life care plan, not Plaintiff's need for specific treatment.  *See generally* doc. 106-2; *id.* at 2 ("In short, the

12

cost calculation in [Plaintiff's] Life Care Plan, . . . does not account for the increase in the future cost of care.  Furthermore, the life care plan does not account for the time value of money.  Both concepts are discussed and explained in more detail in the following sections of this report.").  Defendant does not cite any authority suggesting that an economist calculating the present value of a life care planner's recommendations must conduct "an independent assessment of the recommendations", doc. 90 at 9, and at least one court has expressly rejected that proposition in a case involving Volkov.  *Williams v. Dollar Tree Stores, Inc.*, 2022 WL 4133331, at *3 (W.D. Okla. Aug. 3, 2022) ("Defendant also complains that Dr. Volkov took [the life care planner's] estimated medical costs at face value rather than independently researching the costs of medical procedures and verifying the 'frequency and duration of treatments for the Plaintiff.'  [Cit.]  This argument is again best reserved for cross-examination and does not warrant excluding Dr. Volkov's testimony.").[5]

---

[5] Defendant argues that "[a]n expert 'may not simply repeat or adopt the findings of another expert without attempting to assess the validity of the opinions relied upon.' " Doc. 90 at 8-9 (quoting *In re Polypropylene Carpet Anitrust Litig.*, 93 F. Supp. 2d 1348, 1357 (N.D. Ga. 2000)).  Defendant, however, does not point to any portion of the record where Volkov "repeat[s] or adopt[s]" Joye's predications regarding Plaintiff's specific needs.  As discussed, Volkov's opinions are simply present value calculations of the figures in the life care plan.  Defendant also complains that Volkov completed his assessment in only "four to six hours."  Doc. 90 at 8.  The Court declines to take the

Defendant also challenges Volkov's testimony under *Daubert*'s "helpfulness" prong, asserting that it involves "a very technical economic analysis that will only confuse the jury."  Doc. 90 at 11; *see also id.* at 12 ("Dr. Volkov's Assessment relies heavily on growth rates, discount rates, future inflation rates, the 'Municipal Market Analytics Yield Curve', 'future value', and 'present value'. These concepts require technical economic knowledge would not be helpful to a jury[.]").  Defendant cites no authority for the proposition that an economist's future value opinions are inadmissible when he uses complex calculations or terminology, *see generally* docs. 90 & 114, nor does she address the authority suggesting that the complexity of relevant economic issues in a case *bolsters* the helpfulness of an economist's testimony.  *See, e.g.*, *Hard Candy, LLC v. Anastasia Beverly Hills, Inc.*, 2018 WL 10322164, at *13 (S.D. Fla. Jan. 13, 2018).   Her motion to exclude Volkov's testimony is therefore **DENIED**.  Doc. 90.

---

drastic step of excluding all of his testimony on this basis.  Defendant may address whether Volkov should have spent more time performing his calculations on cross-examination.

## IV.  Defendants' motions to exclude Dr. Sean Mahan and Dr. James Chappuis' causation testimony.  (Docs. 91 & 93)

Defendant challenges the causation testimony of Plaintiff's retained expert Dr. Sean Mahan, and her treating physician Dr. James Chappuis.  Doc. 91 (*Daubert* motion regarding Mahan); doc. 93 (*Daubert* motion regarding Chappuis).[6]  She argues that neither expert conducted a reliable "differential etiology" in reaching their opinions.  *See, e.g.*, doc. 91 at 12-13; doc. 93 at 23.

A "differential etiology" is a  "scientific technique where the expert identifies the cause of a medical problem by 'eliminating the likely causes until the most probable one is isolated.' " *Longoria v. Ethicon, Inc.*, 2020 WL 7238151, at *2 (M.D. Fla. Dec. 9, 2020) (quoting *In re C.R. Bard, Inc.*, 948 F. Supp. 2d 589, 602 (S.D.W. Va. 2013)).  "When properly conducted, a differential diagnosis[7] can be a reliable methodology under *Daubert*."

---

[6]  Defendant complains that "Dr. Chappuis claims he was Plaintiff Dunn's treating physician at the Spine Center even though Dr. Chappuis saw her only three times via Zoom and one single time in person from the time of the accident until his deposition in January 2021."  Doc. 93 at 2.  Defendant, however, does not ask the Court to exclude Chappuis' testimony based on Plaintiff's purportedly deficient disclosures.  *See generally* doc. 93.

[7]  "The Eleventh Circuit has often used 'differential diagnosis' and 'differential etiology' interchangeably.  While many parties often use 'differential diagnosis', the more precise term is in fact 'differential etiology.' "  *Sampson v. Carnival Corp.*, 2016 WL 7377226, at *4 n.6 (S.D. Fla. Dec. 16, 2016) (citing *Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1194 n.5 (11th Cir. 2010)).

*Guinn v. AstraZeneca Pharms. LP*, 602 F.3d 1245, 1253 (11th Cir. 2010). It "need not rule out all possible alternative causes[.]" *Id.* "[T]he alternative causes . . . affect the weight that the jury should give the expert's testimony and not the admissibility of that testimony[.]" *Katsiafas v. C. R. Bard, Inc.*, 2020 WL 1808895, at *2 (M.D. Fla. Apr. 9, 2020) (internal quotations and citation omitted). "However, a 'differential diagnosis that fails to take serious account of other potential causes may be so lacking that it cannot provide a reliable basis for an opinion on causation.' " *Dotson v. Am. Med. Sys., Inc.*, 2020 WL 2844738, at *3 (N.D. Ga. Mar. 11, 2020) (quoting *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 265 (4th Cir. 1999)).   Courts have held that a plaintiff's causation expert's etiology is unreliable if a defendant points to "some likely cause of the plaintiff's illness other than the defendants' action and [the causation expert] offer[s] no reasonable explanation as to why he or she still believe[s] that the defendants' actions were a substantial factor in bringing about that illness." *Wilson v. Taser Int'l, Inc.*, 303 F. App'x 708, 714 (11th Cir. 2008) (quoting *Wheat v. Sofamor, S.N.C.*, 46 F. Supp.2d 1351, 1358 (N.D. Ga. 1999)); *see also Katsiafas*, 2020 WL 1808895, at *2 (differential etiology is not reliable if "the expert is unable

to offer any explanation for his or her causation opinion in light of the alternative causes offered by the opposing party.").

1. Defendant's *Daubert* motion regarding Mahan. (Doc. 91)

Defendant argues that Mahan did not conduct a reliable etiology to reach his opinion that the auto collision caused Plaintiff's cervical and lumbar spine herniations. *See, e.g.*, doc. 91 at 9, 13. She raises two distinct challenges to his methodology. First, she contends that Mahan did not sufficiently rule out long-term, degenerative injuries as the cause of her herniations. *See id.* at 9-15. Second, she argues that Mahan's opinion that the auto collision caused Plaintiff's herniations is inadmissible because he relied on insufficient "facts or data." *See id.* at 12, 15. The Court will address these challenges in turn.

In three separate reports, Mahan opines that Plaintiff's herniations in the specific cervical and lumbar discs are indicative of an acute traumatic injury, as opposed to a long-term degenerative condition. *See* Doc. 105-1 at 424 (cervical spine opinions); doc. 105-2 at 3-4 (lumbar spine opinions). Defendant challenges Mahan's reasoning regarding each of those discs separately. *See* doc. 91 at 9-15. First, she argues that his analysis regarding the "acuteness" of Plaintiff's C4-5 herniation is

17

unreliable because he based the opinion on three insufficient "theories": (1) Mahan did not "see any osteophytes [*i.e.*, bone spurs]" in Plaintiff's imaging, which, in his experience, indicates that the injury "does not have the appearance of being chronic, degenerating herniated disc that's been there for a long time", doc. 105-1 at 102, (2) the herniated disc "clearly goes outside of the bone", which does not indicate a degenerative condition, *id.*, and (3) a "bright signal" in the herniated disc is indicative of acuteness, *id.* at 106.  *See* doc. 91 at 10-11.

Defendant argues that the first "theory" is not a reliable basis for Mahan's "acuteness" opinion because he based the theory on his experience, as opposed to "medical literature or peer-reviewed articles." Doc. 91 at 10; *see also* doc. 105-1 at 104 (Mahan testifies that "if this herniated disc was present three or four years ago, I would expect it to be covered by osteophytes by now.").  As discussed, however, an expert may base his opinions on his "experience", *see* Fed. R. Evid. 702, and Defendant does not appear to argue that Mahan failed to "explain *how* [his] experience leads to the conclusion reached", *Frazier*, 387 F.3d at 1261.  *See* doc. 91 at 10.  As to the second "theory," Defendant cites Mahan's testimony that Plaintiff's herniated disc going beyond the bone

"doesn't mean it's acute, but it doesn't have the appearance of a chronic degenerated disc [either.]"  Doc. 91 at 10-11 (quoting doc. 105-1 at 124). Although the parties do not clarify the precise meaning of this testimony, Mahan appears to suggest that although a disc protruding "beyond the bone" does not *necessarily* indicate an acute injury, it is generally inconsistent with the "appearance of a chronic degenerating herniated disc." Doc. 105-1 at 124.  To the extent Defendant argues that Mahan's lack of certainty under the second "theory" weakens his opinion, she may address the issue on cross examination.  Finally, Defendant argues that the Court should not consider Mahan's third "theory" regarding the "bright signal" in Plaintiff's MRI because Mahan did not mention "bright signals" in his report.  Doc. 91 at 11.  Even if the Court did not consider the third theory, Mahan's first two theories indicate that he has not "fail[ed] to take serious account" of Plaintiff's cervical spine herniation in C4-5 resulting from a chronic condition, *Dotson*, 2020 WL 2844738, at *3, and the Court decline to exclude the opinion on this basis.

Defendant also challenges Mahan's opinion that the herniation at C5-6 is indicative of acute injury: "[Mahan] concluded that the C5-6 herniation has the appearance of an acute herniated disc but that 'doesn't

mean that it's acute' and in fact could just be Plaintiff['s]normal spine."
Doc. 91 at 12 (quoting doc. 105-1 at 124).  Mahan, testified, however, that
the disc has "signal changes . . . [and] bright signal . . . which suggests
relative acuteness", doc. 105-1 at 119, and that the "herniated disc . . .
goes beyond the cervical disc degenerative changes" in C5-6, *id*. at 118.
*See also id*. at 124 ("And you can see that the herniated disc [at C5-6] is
clearly coming beyond the bones.  This does not have the appearance of a
chronic degenerating herniated disc.  That doesn't mean that it's acute,
but it doesn't have the appearance of a chronic degenerated disc.").
Defendant may cross examine Mahan on his degree of confidence in his
opinions based on the sources he reviewed; however, the Court declines
to exclude his cervical herniation "acuteness" opinions on this basis.

Defendant also challenges Mahan's opinion that Plaintiff's lumbar
herniations at L4-5 and L5-S1 are indicative of an acute traumatic injury.
Doc. 105-2 at 3 (Mahan's lumbar report); doc. 91 at 13-15 (Defendant's
challenge).  He opines that the herniation in L4-5 is acute because there
are "no osteophytes associated with the herniating disc", and the
herniation "extend[s] beyond the patient's preexisting degenerative
change."  Doc. 105-2 at 3-4.  As to L5-S1, he explains that "[t]here are no

osteophytes associated with the herniating disc and there is bright signal within the herniating disc . . . , suggesting relative acuteness." *Id.* As with his cervical spine opinions, Mahan has not failed to explain why he ruled out degenerative conditions as causes of the herniations at these lumbar discs. To the extent Defendant contends that these explanations weaken Mahan's "acuteness" opinions, she may address the issue on cross-examination.

As discussed, Defendant also argues that the Court should exclude Mahan's opinion that the collision caused Plaintiff's herniations because he relied on insufficient "facts or data." *See* doc. 91 at 12-13, 15. Defendant primarily argues that Mahan's opinion is based on fewer sources than the unreliable causation opinions in two cases: *Cooper v. Marten Transp., Ltd.*, 539 F. App'x 963 (11th Cir. 2013), and *Rangel v. Anderson*, 202 F. Supp. 3d 1361 (S.D. Ga. 2016). *See* doc. 91 at 12, 15. In *Cooper*, the Eleventh Circuit affirmed the district court's exclusion of a treating physician and a surgeon's testimony that a "collision caused the [plaintiffs'] need for treatment" when they based their opinions on the plaintiffs' medical histories, post-collision physical examinations, nerve studies, x-rays, discograms, and other diagnostic tests. 539 F. App'x at

965.  The court explained:

> [The plaintiffs' treating physician and surgeon] simply conducted physical examinations and reviewed the [plaintiffs'] medical histories to arrive at the conclusion that the . . . collision caused the [plaintiffs'] injuries in this case. The doctors never compiled a comprehensive list of possible causes that they subsequently systematically and scientifically rul[ed] out . . . until a final, suspected cause remain[ed].

*Cooper*, 539 F. App'x at 966 (quotations and citation omitted).  Similarly, in *Rangel*, this Court excluded a treating physician's causation testimony linking a car accident to a plaintiff's injuries when he "relied on even fewer sources" than the experts in *Cooper*: (1) post-accident radiology reports, (2) the plaintiff's testimony, (3) the physician's post-accident treatment and evaluation of the plaintiff, and (4) the physician's training and experience.  202 F. Supp. 3d at 1370.  *Cf. Grimes v. Sysco Corp.*, 2021 WL 2547651, at *4, *6 (N.D. Ga. Jan. 21, 2021) (citing *Rangel*, and admitting Chappuis' causation testimony which was "based on Plaintiff's medical history, statements provided by Plaintiff, and other medical records generated during Plaintiff's treatment following the subject accident, including diagnostic tests and MRI imaging.").

The parties do not dispute that Mahan based his opinion on Plaintiff's post-accident MRI imaging, his education, training, and

experience, and his knowledge that the collision occurred. *See* doc. 91 at 9; doc. 105 at 2.[8]  Accordingly, the Court agrees with Defendant that Mahan relied on fewer facts and less data than the experts in *Rangel* and *Cooper*, and Plaintiff has not carried her burden of pointing to an instance of Mahan "systematically and scientifically rul[ing] out specific causes until [the collision] remains." *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1342 (11th Cir. 2010).   Plaintiff argues that that *Rangel* is distinguishable because the treating physician in that case based his testimony on *reports* related to post-accident imaging, whereas Mahan relied on the *actual imaging*. *See* doc. 105 at 6.  This distinction is not persuasive given the Eleventh Circuit's analysis in *Cooper*, where the experts' testimony was excluded when it was based on more sources than Mahan's opinions, including actual imaging.  539 F. App'x at 966.

The Middle District of Florida's discussion of Mahan's causation testimony in two personal injury cases bolsters the Court's conclusion.  In *Castro v. KFC Corporation*, the court admitted Mahan's testimony in a

---

[8] Plaintiff asserts that Mahan relied on "the standards set forth in American Society of Neuroradiology", doc. 105 at 2; however, she does not explain how he used those standards to render his opinions. *See generally id.*  His reports indicate that he merely used those standards for the "definitions in [his] report[s]."  Doc. 105-2 at 2, 4.

slip-and-fall case[9] when he based his opinions on a plaintiff's medical history, the fact that the plaintiff's doctors who treated him for prior falls did not order radiological studies, and radiological images generated after the fall, and explained why he thought prior falls were less likely injury causes.  2021 WL 4263362, at *2-*3 (M.D. Fla. Aug. 30, 2021) (citing *Cooper*, 539 F. App'x at 964, 967).  In *Collett v. Fisher*, however, the court excluded Mahan's causation testimony in an auto wreck case when he based his opinions on "only post-accident medical images and knowledge that an accident occurred[.]"  2022 WL 710249, at *2 (M.D. Fla. Jan. 19, 2022).  Here, as in *Collett*,

> Dr. Mahan has missing links in his logic when he concludes the medical images he reviewed establish the accident caused trauma to [Plaintiff].  Besides post-accident diagnostic images, Dr. Mahan did not receive [Plaintiff's] medical record, which could have revealed other causes of [her] trauma. In fact, cumulatively, his knowledge is limited.  He did not communicate with [Plaintiff] nor other physicians.  He only knows an accident occurred without a solid understanding of the dynamics.  With only post-accident medical images and knowledge that an accident occurred, Dr. Mahan has insufficient data to truly execute the scientific process, so he takes logical leaps, creating missing links.

---

[9] In *Castro*, Mahan opined that "Plaintiff's eleven herniated discs could have been caused by the KFC fall, could have preexisted the KFC fall and been acutely aggravated by it, or could be a combination of the two."  2021 WL 4263362, at *2.

2022 WL 710249, at *2.  Plaintiff has not pointed to any portion of the record closing those "missing links", *see generally* doc. 105, and she has not carried her burden of establishing the reliability of Mahan's opinion. Accordingly, Defendant's motion to exclude his opinion that the collision caused Plaintiff's herniations is **GRANTED**.  Doc. 91, in part.  However, as discussed, her request to exclude his opinion that the herniations are indicative of an acute traumatic injury, as opposed to a long-term degenerative condition, is **DENIED**.  Doc. 91, in part.

    2. <u>Defendant's *Daubert* motion regarding Chappuis.  (Doc. 93)</u>

       Defendant challenges the sufficiency of the "facts or data" on which Chappuis relied to opine that "the accident caused [Plaintiff's] cervical disc herniations," doc. 93 at 2: (1) his review of post-accident medical records generated by the "Spine Center,"[10], (2) Plaintiff's post-accident MRIs, (3) Chappuis' "consult[ations] with [Plaintiff]" where he "obtained her history", and (4) his 33 years of experience as a spine surgeon, doc. 104 at 4.  Defendant argues that these sources cannot form the basis for a reliable etiology.  *See, e.g.*, doc. 111 at 9-10.

---

[10]  Chappuis testified that he owns the Spine Center.  Doc. 104-1 at 12.

The Court declines to exclude Chappuis' specific causation testimony under *Daubert*'s reliability prong. He indicated multiple times at his deposition that the self-reported "history" Plaintiff provided revealed no prior injuries or traumatic events other than the collision which he believed could have caused the herniations:

> Well, I mean, if the patient's history is true, and she doesn't have any history of other -- any other injuries, I don't really see how whatever [additional medical records] said would change my opinion.

Doc. 104-1 at 19.[11] This testimony indicates that he "ruled out" potential alternative causes by learning about Plaintiff's medical and injury history, and concluding that the collision was the most likely cause given the absence of another potential cause. Chappuis' etiology clears

---

[11] *See also*, *e.g.*, doc. 104-1 at 18 ("And unless there's other information . . . where she had another injury . . . that's the only injury that I knew that she'd been treated[.]"); *id.* at 19 ("I don't see how [additional medical records] would have changed my [causation] opinion on this, unless there was some prior injuries [sic] that I didn't know about."); *id.* ("If I didn't believe the patient, from what the history tells me here, if this is all correct, which I assumed it was, I don't see how that would -- again, would have changed my opinion."); *id.* at 23 (explaining that he based his opinion on, *inter alia*, "the fact that I don't have any history of any prior injuries."); *id.* at 24 ("Q: So how do you know that these herniations didn't preexist the accident? A: . . . I'm assuming there were no other injuries. I wasn't told of any."); *id.* at 28 ("Q: Would her occupation [as a cleaner] enter into that [causation opinion], in any way? A: I think she was . . . a cleaning person -- something like that. Again, if she were injured, or had an on-the-job injury, and those records are available for me to review, I'd be happy to. But I don't know that I was given any -- a history of any records of any injuries as it related to her work.").

*Daubert*'s reliability hurdle because he has not "utterly fail[ed] . . . to offer an explanation for why . . . alternative cause[s were] ruled out." *Hendrix ex rel. G.P.*, 609 F.3d at 1197 (quoting *Clausen v. M/V NEW CARISSA*, 339 F.3d 1049, 1061 (9th Cir. 2003) (quotations omitted)).

Defendant argues that Chappuis' reliance on Plaintiff's self-reported history is insufficient because it is merely a "subjective" account "which he only 'assumed' was correct without any independent confirmation." Doc. 93 at 14 (quoting doc. 104-1 at 19). She also points out that Chappuis did not consider Plaintiff's "records from any of [her] prior providers [or] her EMS or emergency room records following the accident." *Id.* at 3. As the Seventh Circuit has explained, however:

> If a differential etiology was used and [an expert was] unaware of aspects of [a plaintiff's] work or medical history, that doesn't necessarily mean the expert should be struck. On this point, we have instructed that when a medical expert has "relied upon a patient's self-reported history and that history is found to be inaccurate, district courts usually should allow those inaccuracies in that history to be explored through cross-examination."

*Myers v. Illinois Cent. R. Co.*, 629 F.3d 639, 645 (7th Cir. 2010) (quoting *Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 586-87 (7th Cir. 2000)); *see also Dixon v. Grand Trunk W. R.R. Co.*, 259 F. Supp. 3d 702, 708-9 (E.D. Mich. 2016) (when causation experts "took [plaintiff] at his word in

describing family medical history and the tasks he did at work[,] . . . [they are] are not required to independently verify a patient's self-reported history.").[12]  To the extent Defendant contends that Chappuis should have considered additional sources, or that his causation opinion is weakened because Plaintiff provided an inaccurate history, Defendant may address those issues on cross examination.[13]

Defendant attempts to analogize this case to several cases, all of which are distinguishable.  He argues that Chappuis "relied essentially on the same, if not much less, insufficient facts and data relied upon by the experts in *Rangel* and *Cooper*."  Doc. 93 at 14-15.  In *Cooper*, however, the treating physicians "simply conducted physical examinations and reviewed the [plaintiffs'] medical histories to arrive at the conclusion that [a specific] collision caused [their] injuries in this case.  [They] never

---

[12]  Defendant asserts, without citation to Chappuis' deposition, that Plaintiff "is a layperson who cannot offer the necessary medical testimony to establish that her need for complicated treatment and procedures was created by the subject accident as opposed to her life history."  Doc. 93 at 20-21.  Chappuis did not testify that he relied on Plaintiff's "medical testimony"; rather, as discussed, he explained that Plaintiff did not make him aware of other traumatic events which could have caused her spinal injuries.

[13]  Defendant also argues that the sources Chappuis relied upon are insufficient based on standards promulgated by the North American Spine Society ("NASS") and American Academy of Orthopaedic Surgeons ("AAOS").  Doc. 93 at 15-16.  She cites no authority suggesting that a causation expert must comply with those standards to pass muster under *Daubert*.

compiled a comprehensive list of possible causes that they subsequently 'systematically and scientifically rul[ed] out . . . until a final, suspected cause remain[ed].' " 539 F. App'x at 967 (quoting *Kilpatrick*, 613 F.3d at 1342).  Here, although Defendant takes issue with the thoroughness of Chappuis' inquiry, he did explain why he "ruled out" non-collision alternatives: Plaintiff did not report a history of other events or injuries. Further, in *Rangel*, the expert relied on "only Plaintiff['] [post-accident] radiology reports[,] . . . his treatment and observation of Plaintiff, . . . Plaintiff's testimony, and [the expert's] own expertise[.]" 202 F. Supp. 3d at 1370.  The Court did not discuss whether the "Plaintiff's testimony" gave the expert insight as to the possibility of alternative causes, as Plaintiff's conversations with Chappuis did in this case.[14]

Defendant also cites *McClain v. Metabolife International, Inc.*, 401 F.3d 1233 (11th Cir. 2005), and *Bowers v. Norfolk Southern Corporation*, 537 F. Supp. 2d 1343 (M.D. Ga. 2007), which both stand for the

---

[14]  In her reply, Defendant argues that Chappuis only met with Plaintiff three times via videoconferencing software, and once in person.  Doc. 111 at 3 (noting that the in-person meeting occurred four days before Chappuis' deposition).  She notes that in *Grimes*, the Court admitted Chappuis' causation testimony when he met with a plaintiff "**eighty times** prior to his expert opinion on the medical causation on her injuries." *Id.* (citing 2021 WL 2547651, at *3).  Defendant may address the number of Chappuis' conversations with Plaintiff during cross examination.

proposition that an expert may not opine that an event caused an injury based on a mere temporal connection between an event and the onset of symptoms. *See* doc. 93 at 17-20 (discussing *McClain*); doc. 111 at 7-8 (discussing *Bowers*).[15] Chappuis, however, did not rely on mere temporal proximity. Though Defendant contends that he should have considered sources beyond Plaintiff's self-reported history in ruling out other causes, he did not utterly fail to explain why he ruled them out. *Cf. Bowers,* 537 F. Supp. 2d at 1356 (doctor did not adequately account for "alternative explanations" when the plaintiff "gave a medical history", including a statement that "[the plaintiff's] cervical and lumbar complaints began thirty days [before the alleged injury]", and the doctor "fail[ed] to address this important information[.]").

Finally, Defendant argues that at Chappuis' second deposition, he testified that he reviewed an MRI of Plaintiff's lumbar spine which indicated that she experienced "recent trauma", but that he "admitted he

---

[15] *See also Bowers*, 537 F. Supp. 2d at 1359 ("The *post hoc ergo propter hoc* fallacy assumes causality from temporal sequence. It literally means 'after this because of this.' It is called a fallacy because it makes a false assumption based on the false inference that a temporal relationship proves a causal relationship." [Cit.] This fallacy is one that ancient logicians exposed several millennia ago, but that still causes the naïve to stumble. Opinions based on little, if anything, more than this time-dishonored fallacy should not go to the jury." (citations omitted)).

was unaware of what this 'recent trauma' was." Doc. 93 at 15. Defendant, however, does not clarify the significance of this testimony, *see generally* docs. 93 & 111, nor does Chappuis' deposition transcript. *See* doc. 104-2 at 10-11. The Court declines to exclude his testimony on this basis.

## CONCLUSION

For the foregoing reasons, Defendant's motions to exclude Joye, Volkov, and Chappuis' testimony are **DENIED**, docs. 90, 92 & 93, and her motion to exclude Mahan's testimony is **GRANTED**, in part, and **DENIED**, in part, doc. 91. Since further argument is unnecessary, Defendant's motion for oral argument regarding her *Daubert* motions is **DENIED**. Doc. 94. *Cf.* S.D. Ga. L. Civ. R. 7.2 ("Motions shall generally be determined upon the motion and supporting documents.").

**SO ORDERED**, this 31st day of January, 2023.

_____
CHRISTOPHER L. RAY
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA